UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

IN THE MATTER OF THE
EXTRADITION OF PETER GERMANY

MEMORANDUM
AND ORDER
04-M-1325 (RML)

-------------------------------------------------------X

LEVY, United States Magistrate Judge:

    The United States of America, acting on behalf of the government of France, has made two requests for the extradition of Peter Germany, pursuant to 18 U.S.C. § 3184. I have conducted extensive hearings addressed to whether the evidence presented by the government of France is sufficient to support extradition and whether relator Peter Germany ("Germany" or the "relator") has established any defense to extradition. Evidence was presented on January 31, 2005, May 25, 2005, and July 27, 2005. For the reasons stated below, I find that the prerequisites for extradition have been satisfied with respect to both requests.

## BACKGROUND

    The French government has brought two charges against Germany, a citizen of France and St. Lucia. First, on July 12, 2005, the Tribunal de Grande Instance de Créteil, France convicted Germany *in absentia* and sentenced him to ten years in prison for committing various drug importation and trafficking offenses. (Jan. 19, 2005 Request for Extradition; Feb. 9, 2005 Supplement; Amended Complaint and Affidavit in Support of Extradition ¶ 1(a); Memorandum from the Embassy of France, dated Oct. 27, 2005.) In that charge, French authorities alleged that Germany participated in a drug importation and trafficking scheme by serving as the main supplier of cocaine for an international drug trafficking organization in or about and between February 2003 and October 2004. (Jan. 19, 2005 Request for Extradition.) Second, the Tribunal

de Grande Instance d'Aix en Provence, France convicted Germany *in absentia* and sentenced him to sixteen years in prison for various other drug importation and trafficking crimes. (Jan. 26, 2005 Request for Extradition.) In that charge, French authorities alleged that Germany participated in a drug importation and trafficking scheme by serving as the main supplier of cocaine for an international drug trafficking organization in or about and between 1999 and 2002. (Amended Complaint and Affidavit in Support of Extradition ¶ 3(b)(i).)[1]

The French government's investigation of Germany appears to have begun in 2002. On or about June 15, 2002, an individual named Georges Sainte Rose was arrested in Sainte-Anne, Martinique in connection with the importation of 17 kilograms of cocaine to Paris, France. (Id. ¶ 3(b)(ii).) Upon his arrest, Sainte Rose told French law enforcement and the examining Magistrate that he had obtained the 17 kilograms of cocaine from Peter Germany, whom he described as a former soccer player with a scar on his ear. (Id. ¶ 3(b)(iii), (v).) Sainte Rose also said that he had previously transported 35 kilograms of cocaine for Germany over the course of five trips between Martinique and Paris. (Id. ¶ 3(b)(iv)). The government submits that Sainte Rose's statements concerning those trips were confirmed by airline tickets and hotel receipts. (Id.; see also Letter of AUSA Alyssa A. Qualls, dated June 27, 2005 ("Qualls Ltr."), Ex. 16.)

---

[1] Because Germany was convicted *in absentia*, the convictions are regarded merely as charges against Germany. Gallina v. Fraser, 278 F.2d 77, 78-79 (2d Cir. 1960); In re Extradition of Ribaudo, No. 00 Crim. Misc. 1 Pg. (KNF), 2004 WL 213021, at *4 (S.D.N.Y. Feb. 3, 2004); In re Extradition of Ernst, 97 Crim. Misc. 1 Pg. 22(HBP), 1998 WL 395267, at * 7 (S.D.N.Y. July 14, 1998). See also Lo Duca v. United States, CV-95-713 (DGT), 1995 WL 428636 (E.D.N.Y. July 7, 1995) (district court made independent findings of probable cause notwithstanding existence of conviction *in absentia* by Italian court), aff'd, 93 F.3d 1100 (2d Cir. 1996).

As part of the same investigation, French authorities interviewed an individual named Christian Cardon, who told French law enforcement and the examining Magistrate that, at the request of someone named "Peter," he retrieved a bag containing four packages of cocaine from the Etap Hotel in Paris, gave the bag to two individuals in exchange for approximately 200,000 francs, and brought the 200,000 francs to Peter in Martinique. (Amended Complaint and Affidavit in Support of Extradition ¶ 3(b)(vi).) Cardon also stated that, at Peter's request, he picked up drugs on the beach in St. Lucia, after the drugs were delivered by fishermen. Cardon said he picked up a total of 39 kilograms of drugs on three separate occasions, and that Peter was present on two of those occasions. (Id. ¶ 3(b)(vii); Qualls Ltr., Ex. 15.)

On September 17, 2004, Presiding Magistrate Dominique Jaubert of the Tribunal de Grande Instance d'Aix en Provence, France issued a warrant for Germany's arrest in connection with this investigation. The January 26, 2005 Request for Extradition is based on this arrest warrant. (Amended Complaint and Affidavit in Support of Extradition ¶ 2(b).)

In addition, on or about February 9, 2003, French authorities at Orly International Airport in Paris seized 2.125 kilograms of cocaine on a flight from Martinique. (Complaint and Affidavit in Support of Request for Arrest Warrant, sworn to Oct. 2, 2004, at 3.) On October 29, 2003, as part of their probe into the cocaine importation, French authorities searched the residence of an individual named Eric Matime, in Martinique, and discovered 12 kilograms of cocaine there. (Id. at 4.) They then arrested and interviewed Matime and another individual, René Dufrenot, both of whom identified Germany as the head of a network of St. Lucian cocaine suppliers and stated that Germany had supplied a portion of the cocaine seized in Martinique. (Amended Complaint and Affidavit in Support of Extradition ¶ 3(v).) French authorities also

recorded a telephone conversation between Matime and another individual in which the two discussed a certain Saturday delivery. According to Matime's sworn statement, the conversation was with "Peter" and concerned the delivery of cocaine to Paris. (Id. ¶ 3(vi); Qualls Ltr. Ex. 5.)

On October 1, 2004, Investigating Magistrate Sophie-Hélène Chateau of the Tribunal de Grande Instance de Créteil, France issued a warrant for Germany's arrest in connection with this investigation. (Id. ¶ 2(a).) The January 19, 2005 Request for Extradition and its February 9, 2005 Supplement are based on this arrest warrant. (Id.)

## DISCUSSION

Under 18 U.S.C. § 3184, *et seq.*, a fugitive is extraditable provided that three conditions are met: (1) the hearing court has jurisdiction over the fugitive and jurisdiction to conduct the hearing; (2) the fugitive is being sought for offenses for which the applicable treaty permits extradition; and (3) there is sufficient evidence to establish probable cause that the individual appearing is the fugitive sought, and committed the offense charged. See In re Extradition of Sandhu, No. 90 Cr. Misc. 1 (JCF), 1997 WL 277394, at *3 (S.D.N.Y. May 23, 1997); see also Austin v. Healey, 5 F.3d 598, 600 (2d Cir. 1993). In the instant case, it is undisputed that this court has jurisdiction over the relator and that a valid treaty is in force between France and the United States respecting the extradition of fugitives. However, two issues are in dispute: (1) whether the applicable treaty covers the specific offenses with which Germany has been charged, and (2) whether there is probable cause to believe Germany committed those offenses. These issues will be addressed in turn.

A. <u>Principles of Treaty Construction</u>

The applicable extradition treaty between the United States and France, dated April 23, 1996, entered into force on February 1, 2002. (Declaration of Kenneth R. Propp, Esq., dated Feb. 10, 2005 ("Propp Decl.").) Article 2 of the treaty describes the offenses for which extradition may be sought. It states, in pertinent part:

> 1. Acts shall be extraditable if they are punished under the laws in both States by deprivation of liberty for a maximum of at least one year or by a more severe penalty. . . .
>
> 2. An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, or participation in the commission of, an offense described in paragraph 1.
>
> 3. For the purposes of this Article, an offense shall be an extraditable offense:
>
>> (a) whether or not the laws in the Contracting States place the offense within the same category of offenses or describe the offense by the same terminology . . . .

(Propp Decl., Ex. A.)

In support of the Requests for Extradition, the government has submitted a letter from Jean Michel Durand, Esq., the Prosecutor of the Republic, Créteil City, France. The letter explains the legal bases under French law for the charges against Germany. Specifically, the letter states:

> As far as are concerned indictment counts (a), (b) and (c) above [pertaining to the cocaine importation, transportation and smuggling charges], Mr. Germany, essentially in virtue of his role as organizer and director of the above-mentioned criminal gang, can be held responsible, according to French law, of acts committed by other members of his gang, even if he hasn't participated directly in the actual steps of a particular transaction or of a dispatch. . . .

> As far as are concerned indictment counts relative to combination in association described in paragraphs (d) and (e) above [pertaining to the conspiracy charges]: According to French law, these two are distinct indictment counts, even if both remain very largely founded on similar acts and imputable notably to Mr. Germany. Moreover, according to the Penal Code Articles exposed above, the persons are gang members who can be held responsible, even if they don't achieve the pursued intention. . . . Whatever the circumstances, in this case the united elements of proof show that the criminal combination did indeed undertake some drug trafficking and importation preparation in realization of researched intent, such that Mr. Germany could be judged for all the counts of indictment exposed above.

(Letter of Jean Michel Durand, Esq., dated Sept. 27, 2005.)

Interpretation of a treaty must begin with the language of the treaty itself. See Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 180 (1982). Because a treaty is essentially a contract between two nations (see Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for S. Dist. of Iowa, 482 U.S. 522, 533 (1987); Foster v. Neilson, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829) (Marshall, C.J.), overruled on other grounds, United States v. Percheman, 32 U.S. 51, 7 Pet. 51, 1833 WL 4214, 8 L.Ed. 604 (1833)), "it is [a construing court's] responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." Air France v. Saks, 470 U.S. 392, 399 (1985); see also Restatement (Third) of the Foreign Relations Law of the United States § 325 reporters' note 4 (1987) (hereinafter, "Restatement (Third)") (noting that for United States courts "the primary object of interpretation is to 'ascertain the meaning intended by the parties'") (quoting Restatement (Second) of the Foreign Relations Law of the United States §§ 146-147 (1965)). In determining the intended meaning of the parties, a court may look to a treaty's negotiating and drafting history (see El Al Israel Airlines, Ltd. v. Tseng, 525 U.S. 155, 156

(1999); Saks, 470 U.S. at 400), as well as the subsequent practice of the parties in their application of the treaty. See Restatement (Third) § 325(2) & comment C. Construction of an extradition treaty is also guided by the "'familiar rule that the obligations of treaty should be liberally construed' to effect their purpose, namely, the surrender of fugitives to be tried for their alleged offenses." Ludecke v. U.S. Marshal, 15 F.3d 496, 498 (5th Cir. 1994) (quoting Escobedo v. United States, 623 F.2d 1098, 1104 (1980)).

The court's research uncovered no cases interpreting this treaty, and the parties have cited none. However, it cannot reasonably be disputed that the offenses with which Germany has been charged in France are punishable in both the United States and France "by deprivation of liberty for a maximum of at least one year. . . ."[2] In addition, the government has demonstrated to this court's satisfaction that the charges include "attempt or a conspiracy to commit, or participation in the commission of, an offense" punishable by deprivation of liberty for a maximum of at least one year. Based on the plain language of the treaty itself, as well as the French prosecutor's detailed description of the charges against Germany, I find that the treaty

---

[2] For dual criminality, there is no requirement that the name by which the crime is described in the two countries be the same, or that the scope of the offense be coextensive. "It is enough if the particular act charged is criminal in both jurisdictions." Collins v. Loisel, 259 U.S. 309, 312 (1922). Here, the government submits that articles 222-36 and 222-37 of the French Penal Code provide that these offenses are punishable by ten years' imprisonment. Where the conduct is the second offense, as it is here, articles 132-9 and 132-10 of the French Penal Code provide that the maximum term of imprisonment is doubled. (Qualls Ltr. at 11.) Article 450-1 of the French Penal Code provides that a conspiracy to violate articles 222-36 and 222-37 is punishable by ten years' imprisonment. (Id.) The government further submits that, under U.S. law, Germany's conduct would constitute the crimes of illegal drug importation, in violation of 21 U.S.C. § 952; exportation, in violation of 21 U.S.C. § 953; possession with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1); and conspiracy to possess with the intent to distribute, in violation of 21 U.S.C. § 846. These crimes carry a maximum term of imprisonment of 20 years, assuming proof of only an unspecified quantity of cocaine. See 21 U.S.C. §§ 841(b)(1)(c), 960(a), 960(b)(3).

permits extradition for the specific offenses with which Germany has been charged.

### B. Probable Cause

To establish probable cause in an extradition proceeding, the government is not required to present evidence sufficient to justify a conviction. An extradition hearing is narrow in scope and should not be converted into a "dress rehearsal trial." Jhirad v. Ferrandina, 536 F.2d 478, 484 (2d Cir. 1976)). The limited purpose of an extradition hearing is to determine whether the requesting country has presented sufficient evidence to justify holding the defendant to answer the charges pending against him or her, and is not to determine whether or not the defendant is guilty of those charges. See Charlton v. Kelly, 229 U.S. 447, 460-61 (1913); see also Melia v. United States, 667 F.2d 300, 302 (2d Cir. 1981) ("An extradition hearing is not the occasion for an adjudication of guilt or innocence. Rather, its purpose is to determine . . . whether there is sufficient evidence to justify extradition under the appropriate treaty.").

Probable cause is demonstrated by evidence sufficient to support a reasonable belief that the accused committed the crime charged. See Austin, 5 F.3d at 605; Ahmad v. Wigen, 910 F.2d. 1063, 1066 (2d Cir. 1990); Spatola v. United States, 925 F.2d 615, 618 (2d Cir. 1991). Probable cause in extradition proceedings is determined by the same standards used in federal preliminary hearings, held pursuant to Rule 5.1 of the Federal Rules of Criminal Procedure. See Matter of Extradition of Glantz, No. 94 Cr. Misc. 1 p. 25(MHD), 1995 WL 495644, at *2 (S.D.N.Y. Aug. 21, 1995); see also Sindona v. Grant, 619 F.2d 167, 175 (2d Cir. 1980). In making this determination, courts apply a "totality of the circumstances analysis" and use a "flexible, common-sense standard." Illinois v. Gates, 462 U.S. 213, 238- 240 (1983).

Hearsay evidence is admissible in an extradition proceeding. See United States v.

Mulligan, 50 F.2d 687, 688 (2d Cir. 1931); see also In re Ryan, 360 F. Supp. 270, 273 (E.D.N.Y.) (determination of probable cause in an extradition proceeding may rest entirely upon hearsay), aff'd, 478 F.2d 1397 (2d Cir. 1973). Of course, "the hearsay character of a statement is . . . a factor in determining" its weight. Mulligan, 50 F.2d at 688. However, the "credibility of the witnesses and the weight to be accorded their testimony is solely within the province of the extraditing magistrate." Austin, 5 F.3d at 605 (internal citation and quotation marks omitted). Documentary proof is also admissible, provided it has been properly authenticated. See 18 U.S.C. § 3190.

Moreover, as the government points out, it is settled law that a relator's right to controvert the evidence introduced against him or her is "limited to testimony which explains rather than contradicts the demanding country's proof." Shapiro v. Ferrandina, 478 F.2d 894, 905 (2d Cir. 1973). See also Hooker v. Klein, 573 F.2d 1360, 1368 (9th Cir. 1978) ("Participation by the [relator] at the extradition proceeding is limited; he is not permitted to introduce evidence on the issue of guilt or innocence but can only offer evidence that tends to explain the government's case of probable cause.") (internal quotation marks omitted). Explanatory evidence includes "reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause." In re Extradition of Sindona, 450 F. Supp. 672, 685 (S.D.N.Y. 1978). The relator may not introduce evidence that conflicts with the evidence submitted on behalf of the demanding country (see Collins, 259 U.S. at 315-17), or impeaches the credibility of the demanding country's witnesses. See In re Locatelli, 468 F. Supp. 568, 573-74 (S.D.N.Y. 1979); Sindona, 450 F. Supp. at 685.

Here, the evidence submitted by the government of France in support of its

Requests purports to show that four witnesses have implicated Germany in the above-described crimes. With respect to the January 26, 2005 Request for Extradition, Georges Pierre Sainte Rose, after being informed of his rights to an attorney and to remain silent, provided two statements in which he described his involvement in various drug transactions. (See Letter of AUSA Alyssa A. Qualls, dated June 27, 2005, Ex. 14.) He explicitly named Peter Germany as the head of the drug trafficking syndicate with which he worked, and he described Germany in detail, even providing his home telephone and cell phone numbers in St. Lucia and describing Germany's family members. (See id. ("The head of this traffic is Peter GERMANY"; "All of the deals that I spoke of were done for Peter GERMANY, except the one with 14 kgs."; "I was working for Peter GERMANY. . . ."; "PETER is an ex soccer player of the [St. Lucia] team. His nickname is SAPEL. He limps from a past car accident and he has a scar on his ear. He is about 1.80 meters tall, he is bald, and he is about forty years old. . . ."; "He owns a spare parts shop for cars.") Germany does not dispute the accuracy of Sainte Rose's description of him.

Christian Cardon, a resident of Fort de France, Martinique who was represented by counsel at the time of his interview, also gave French authorities a detailed statement in which he identified a person named "Peter" as the individual who had supplied him with drugs and arranged his smuggling activities, providing Cardon with airfare to and from Paris and rental car money. (Id., Ex. 15.) He also described the involvement of a person named "Georges," to whom "Peter" had introduced him. (Id.)

With respect to the January 19, 2005 Request for Extradition, the French authorities interviewed René Dufrenot and Eric Matime, and monitored Matime's telephone conversations. Dufrenot, a resident of Fort de France, Martinique, stated that he had been

-10-

approached by a St. Lucian man named Marc Falen, whom he had met in prison in 1992 or 1993[3] and whose real first name was "Peter," to transport cocaine to France. (Id., Ex. 4.) Dufrenot said that he refused, but that he introduced "Peter" to Eric Matime and ultimately assisted in one transaction in which he accompanied Matime to pick up drugs from someone named "Jean-Luc," for which Matime paid Dufrenot 700 euros. (Id.) In a second interview on the same day, Dufrenot stated explicitly that Peter's "real name is Peter GERMANY." (Id.) He described Germany as the head of a network of drug traffickers who dealt directly with Colombian and Venezuelan suppliers. (Id.)

In his interview, Matime stated that the cocaine recovered from his residence did not belong to him but to "René," who had asked him to store the drugs and arrange for their transport to France on behalf of a St. Lucian man named "Peter." (Id., Ex. 5.) When presented with a transcript of an intercepted telephone conversation that took place on September 25, 2003, Matime explained:

> It's a guy from St. Lucia that is calling me, it's Peter. He wants to know how things are and when will [sic] take the Cocaine to Paris. He was in St. Lucia and he wanted to know when I was living [sic] so he could go over to England. – The René that he is mentioning is the one that you have arrested, and the one that left me the merchandise to take over to France.

(Id.) Matime was then asked about two more telephone conversations, recorded on October 1, 2003. With respect to the first call, he stated: "[I]t is still Peter; he was in England. He is talking about the same René, . . . his right hand man in Martinique . . ." With respect to the second call,

---

[3] Records establish that Peter Germany, also known as "Peter MacFarlene," was incarcerated for a five-year term in Fort de France, Martinique on January 3, 1990. (Qualls Ltr. at 9, Ex. 12.)

-11-

he stated: "It is the conversation with Peter he was getting impatient and worried and was prepared to go over to Paris to wait for the 'Coke.'" (Id.)  When asked about Peter's identity, Matime said, "He is a guy from St. Lucia his name is Peter BOUSBECK. . . . René gave me his name." (Id.)  Dufrenot, in his interview, confirmed that the intercepted telephone conversations were between Matime and Marc Falen, whom he later identified as Peter Germany.  (Id., Ex. 4.)

In addition to these four witness statements,[4] the government relies on a summary of corroborative travel documents.  For example, the government's summary of hotel records shows that Sainte Rose, Cardon and Germany were all at the Liberhôtel Terminus in Paris at the same time on five separate occasions in October 2001 and February, April and May 2002.  (Qualls Ltr. at 11, Ex. 16.)  It also shows that the three were present at the Centre International de Séjour in Paris February 14-16, 2002.  (Id., Ex. 17.)

The relator raises a number of arguments in opposition to the extradition request.  First, he contends that both Dufrenot's and Matime's dealings with Germany were limited and that their statements were vague and tenuous, and he points out that Matime identified "Peter" by

---

[4] The government also submits a statement given to French authorities by Jean-Philippe Ceyland, who stated that in July or August 2003 he received a quantity of cocaine from "Peter" in St. Lucia and delivered it to René Dufrenot in Fort de France, Martinique.  (Qualls Ltr., Ex. 7.)  The relator seeks to supplement the record with correspondence from Air Jamaica indicating that Germany was in the United States from January 10, 2003 through April 8, 2003.  (See Letter of Richard B. Lind, Esq., dated Nov. 30, 2005.)  The government objects, arguing that these records are improper because they "merely serve to contradict the statement of Mr. Ceyland and impeach his credibility."  (Letter of AUSA Alyssa Qualls, dated Dec. 1, 2005.)  Having reviewed Ceyland's statement closely, however, I find that the documents do not serve to contradict or impeach Ceyland's statement, because he stated that the events took place in July or August 2003, months after Germany returned to St. Lucia.  (See Qualls Ltr., Ex. 7 at 1 ("The second time that I went to Sainte Lucia goes back to July - [A]ugust at the time of the Carnival of [S]aint Lucia.").  Thus, even if the documents are admissible, they are irrelevant.  Regardless, Ceyland's statement adds little to the others described above, in that Ceyland did not provide a last name for "Peter" or describe his physical appearance.

-12-

the last name "Bousbeck." (Letter of Richard B. Lind, Esq., dated July 14, 2005 ("Lind Ltr."), at 2.) However, both Dufrenot and Matime described the drug trafficking activities of "Peter" in some detail, and although Matime identified the voice on recorded telephone conversations as that of "Peter Bousbeck," he said that "René" had introduced the two, and Dufrenot confirmed that the voice was that of Germany. (See Letter of AUSA Alyssa Qualls, dated July 21, 2005 ("Qualls 7/21/05 Ltr.").)

The relator also avers that Matime's statements concerning the September 25, 2003 and October 1, 2003 telephone conversations could not be accurate, since Matime stated that "He [Peter] was in St. Lucia" at the time of the September 25, 2003 call and "he [Peter] was in England" on October 1, 2003, whereas travel records indicate that Germany arrived in New York on September 17, 2003 and departed on November 30, 2003. (Lind Ltr. at 2.) The government argues that Germany's travel records are "nothing more than an improper attempt to impeach the credibility of Mr. Matime, and therefore should be disregarded." (Qualls 7/21/05 Ltr. at 2 (citing In re Locatelli, 468 F. Supp. at 573-74.)) Regardless, as the government also points out, the fact that Matime may have been misled or confused as to Germany's whereabouts is of no moment and does not negate probable cause to believe that Germany was the other participant in the telephone conversations.

With respect to the January 26, 2005 Request, the relator argues that Sainte Rose and Cardon "are admitted criminals," that the government provided only a summary of Sainte Rose's and Cardon's travel records and not the documents themselves, and that Sainte Rose could have acquired personal information about Germany from public sources, due to "Germany's relative celebrity as a member of the St. Lucian soccer team." (Lind Ltr. at 4 and

n.3.) He also points out that Cardon partially recanted his statement to authorities when he later told the examining Magistrate that there was no link between 10,000 francs he received from Germany and the work he was doing for him. (Id., Ex. A.) However, Cardon never rescinded – and in fact confirmed – his detailed statements concerning the involvement of the person he knew as "Peter" in drug trafficking activities. (See Qualls Ltr., Ex. 6.) Moreover, the fact that Sainte Rose and Cardon were themselves involved in criminal activity does not call their statements into doubt for purposes of determining probable cause. Cf. United States v. Hampton-El, No. S5 93 Cr. 181, 1994 WL 708156, at *6 (S.D.N.Y. Dec. 20, 1994) (explaining that attributing a statement to an alleged co-conspirator "does not materially weaken its force for probable cause purposes," particularly when there is a substantial basis for believing that the co-conspirator "was heavily involved in the activities in question."). Finally, the absence of original hotel and travel records does not prevent a finding of probable cause, since, as explained, hearsay is admissible in extradition hearings.

In short, I find that the evidence as a whole supports a reasonable belief that the relator committed the charged crimes. The statements of Sainte Rose, Cardon, Matime and Dufrenot, combined with corroborating summaries of travel documents, demonstrate probable cause to this court's satisfaction. The relator has not brought forth any "reasonably clear-cut proof" to negate the government's showing. Sindona, 450 F. Supp. at 685.

## CONCLUSION

For the reasons stated above, I find that the French extradition requests satisfy their burden of establishing that there is probable cause to believe that Peter Germany is guilty of narcotics importation and conspiracy to commit drug trafficking. Accordingly, pursuant to 18 U.S.C. § 3184, I am prepared to certify to the Secretary of State that the prerequisites for extradition have been met. The government shall submit, on three days notice, the appropriate orders for certification and commitment.

SO ORDERED.

Dated: Brooklyn, New York
      February 17, 2006

/s/
ROBERT M. LEVY
United States Magistrate Judge